THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
Southern Division

IN THE MATTER OF THE SEARCH OF       )
2005 black Dodge Magnum              )      Magistrate No.
Maryland Tag 1ATG87                  )
VIN:                                 )
                                     )

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

Tucker G. Vanderbunt, Special Agent (SA) with the Federal Bureau of Investigation (FBI), Washington Field Office (WFO), Washington, D.C., (hereinafter the "affiant") being duly sworn, deposes and states as follows:

## INTRODUCTION

1. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been a Special Agent (SA) with the FBI since 2002. I am currently assigned to Squad CR-3, which is responsible for conducting investigations which target large scale narcotics trafficking organizations. From 2002 until September, 2003, I was assigned to a counterterrorism squad. From 1995 until 2002, I was employed as a law enforcement officer of the State of Georgia, during which time I investigated federal, state, and local narcotics violations which have led to the arrest and conviction of numerous narcotics distributors. Since 1995, I have received training and experience in interview and interrogation techniques, arrest procedures, search and seizure, search warrant applications, narcotics, narcotics investigations, white collar crimes, white collar crime

1

investigations, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; requesting, collecting, and analyzing billing records; conducting court-authorized electronic surveillance; and preparing and executing search warrants.

    3.    In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms and other contraband.

    4.    Based on the experience described in the paragraph above, my personal participation in this and other investigations involving illegal drug activity, and extensive conversations with other

Federal Agents and police officers who are knowledgeable of drug-trafficking investigations, your affiant knows that:

(a) Individuals who traffic in illegal controlled substances maintain books, records, receipts, notes, ledgers, money orders, bank records, currency, safe deposit box keys, telephone calling cards, address books, telephone numbers, pager numbers, photographs and other papers relating to the transportation, storage, order, sale and distribution of controlled substances.

(b) Drug traffickers routinely conceal in their residence or the residences of family members, friends and associates, as well as their business locations, and/or in places used by drug traffickers to conduct their drug distribution activity (such as automobiles, stash houses or safe houses) large quantities of currency, financial instruments, precious metals, jewelry and other items of value, which are typically the proceeds of illegal controlled substance transactions;

(c) Drug traffickers commonly maintain telephone number and address books, or papers which reflect names, addresses and/or telephone numbers for other associates of their illegal organization. These individuals often utilize telephones, cellular telephones and pagers to maintain contact with other associates of their illegal businesses, and these telephone records, bills and pager numbers are often found in their places of residence, or the residences of family members, friends or associates, in their business locations, or in places used by drug traffickers to conduct their drug distribution activity, such as stash houses, safe houses or vehicles;

(d) Drug traffickers often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses,

3

safe houses or vehicles;

 (e) Drug traffickers often own, possess and use weapons to facilitate their illegal drug trafficking activities. These weapons are most often secreted in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses, safe houses or vehicles;

 (f) Drug traffickers often use safe deposit boxes to amass, retain and conceal their illegal proceeds to avoid detection. Deposits to bank accounts create an accessible record (or paper trail) of deposits, withdrawal and transfer of funds and banks are required to report cash transactions in excess of $10,000 to the Internal Revenue Service (IRS). Safe deposit boxes, which are readily accessible to drug traffickers, provide a "safe haven" for illegal drug proceeds where there is no such accounting. Law enforcement frequently encounters evidence of such safe deposit boxes, including keys and rental documents, in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses, safe houses or vehicles;

 (g) Drug traffickers often use coded language and terms to disguise conversations about their drug activities. Drug traffickers also frequently use electronic paging devices commonly known as "pagers" or "beepers" to communicate with co-conspirators. A common technique among drug traffickers is to transmit pre-arranged numerical codes to the pager to communicate information, such as price or quantity of drugs, to the individual in possession of the pager.

 (h) Drug traffickers utilize their vehicles to transport money, guns, controlled substances and other items of evidentiary value to and from narcotics transactions. I know from my training and experience that this is often accomplished utilizing the storage areas built into the

vehicle as standard equipment by the vehicle manufacturer. I know as well from my training and experience that drug traffickers often have special hidden compartments built into their vehicles after manufacture. These hidden compartments are often only accessible by special means and law enforcement has personnel trained in locating such specially hidden compartments. I know as well from my training and experience that whether narcotics, guns or money are transported in the passenger compartment, in standard equipment storage areas or hidden compartments forensic chemical evidence of the fact of transportation is left in the vehicle and can be recovered by specially trained evidence technicians in processing and vacuuming of the vehicle. I know as well that in the course of processing a vehicle for such trace evidence technicians can also process the vehicle for fingerprint evidence.

      (i)    Computer hardware, software, documentation, passwords, data security devices, and data may be integral tools of narcotics trafficking and money laundering and may constitute the means of committing these and other crimes. Traffickers often keep computers and computer related equipment, including laptops and hand held computers or "PDAs", in their home, on their person or in their vehicles and utilize the equipment to keep detailed records of their narcotics transactions. Various computer software programs originally designed for balancing home finances are often utilized by traffickers to keep track of drug profits and to launder the money earned through illicit narcotics trafficking. In addition, because information can be easily hidden in a computer in a manner that would prevent immediate identification (for example, coded file names or encryption) and because computer storage devices can be used to store the equivalent of thousands of pages of information (which could take weeks or months to sort), it is often necessary to seize an entire computer system so that a qualified computer expert can accurately retrieve the system's data

in a controlled laboratory setting.

5. This affidavit is based, in part, upon information provided to me by other Special Agents of the FBI, information provided by cooperating individuals, controlled purchases of illegal drugs, physical surveillance, and other information gathered during the course of this investigation. Because this affidavit is being submitted for the limited purpose of securing authorization for the search of a vehicle, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the search warrant requested herein.

6. As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports submitted by other Special Agents of the FBI who are involved in this investigation, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show that there is probable cause to believe that the fruits, evidence, and instrumentalities of violations of the following federal offenses, among others, are presently to be found at the address and vehicle described in Section III of this affidavit: Conspiracy to Distribute and Possess with Intent to Distribute controlled substances, in violation of Title 21, United States Code, §§ 846 and 841(a)(1); and Possession with Intent to Distribute and Distribution of controlled substances, in violations of Title 21, United States Code, § 841(a)(1).

## II. PROPERTY TO BE SEIZED

a. Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular cocaine, or other controlled substances.

b.  Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers.

c   Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money.

d.  United States currency, precious metals, jewelry and financial instruments, stocks and bonds.

e.  Photographs, in particular photographs of co-conspirators, assets and/or controlled substances.

f.  Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition.

g.  Cellular telephones, pagers and records and receipts reflecting their ownership and use.

h.  Indicia of occupancy, residence and/or ownership of the premises described herein, including, but not limited to utility and telephone bills, canceled envelopes and keys.

j.  Any and all electronic data processing and storage devices, laptops, hand held computers or "PDAs", computers and computer systems, keyboards, Central Processing Units, external and/or internal drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs.

k.  Trace evidence of the presence or former presence of controlled substances and

fingerprint evidence indicating and disclosing the identity of persons who had been in or around the search site.

## III. DESCRIPTION OF THE SEARCH SITE

7. This affidavit is respectfully submitted in support of an application for a warrant to search and seize evidence from the property commonly known as:

    a) A 2005 black Dodge Magnum bearing Maryland tag 1ATG87. The vehicle is also identified by the            The vehicle is registered to Maria DelCarmen Gonzalez and Arturo Salazar-Rodriguez at

## IV. THE INVESTIGATION

8. This investigation was initiated by the FBI and MPD in June, 2005, based upon information received from a Cooperating Witness (hereinafter referred to as "CW"), who has provided truthful information on numerous occasions about drug traffickers and have never provided any false information. Four controlled purchases have been made from Ricardo Daniel Salazar, aka El Buky, in the vicinity of           er Spring, Maryland, and numerous physical surveillances have been conducted. The following includes surveillance by law enforcement and controlled purchases conducted by a CW:

9. On February 17, 2006, a CW conducted a controlled purchase of cocaine base for $1,600 from Ricardo Daniel Salazar at           ver Spring, Maryland. The CW placed a consensually monitored phone call and arranged to meet Salazar near the McDonald's in the 9100 block of Riggs Road. The CW picked up Salazar at that location and they drove to            Salazar exited the vehicle and entered the Presidential Towers. Salazar later

8

returned to the CW's vehicle and conducted the transaction inside the vehicle. The CW wore an audio/video recording device which recorded the transaction. Surveillance video was also shot during the transaction. The substance delivered to the CW by Salazar was determined to be 55.5 grams of cocaine base with a purity of 92%.

10. On February 23, 2006, CW conducted a controlled purchase of cocaine base for $1,600 from Ricardo Daniel Salazar at ~~~~~~~~~ ad, Silver Spring, Maryland. The CW placed a consensually monitored phone call and arranged to meet Salazar near the McDonald's in the 9100 block of Riggs Road. At that location the CW entered Salazar's 2005 black Dodge Magnum bearing Maryland tag 1ATG87, ~~~~~~~~~. They drove to ~~~~~~~~~ Road where Salazar exited the Dodge Magnum and entered the Presidential Towers. Salazar later returned to the vehicle and conducted the transaction inside the vehicle. The CW wore an audio/video recording device which recorded the transaction. Surveillance video was also shot during the transaction. The substance delivered to the CW by Salazar was determined to be 55.4 grams of cocaine base with a purity of 58%.

11. On March 2, 2006, CW conducted a controlled purchase of cocaine base for $1,600 from Ricardo Daniel Salazar at ~~~~~~~~~ ring, Maryland. The CW placed a consensually monitored phone call and arranged to meet Salazar near the McDonald's in the 9100 block of Riggs Road. Upon arriving in the parking lot, the CW placed a call to Salazar. Salazar advised the CW to pick him up at the Presidential Towers. The CW traveled to Presidential Towers and called Salazar to let him know that the CW was outside. Salazar exited Presidential Towers and entered the CW's vehicle. Salazar conducted the transaction inside the vehicle. During the meeting, Salazar advised the CW that he had a .380 semi-automatic pistol in which he could sell the CW at

9

a later time. The transaction was recorded by an audio/video recording device located in the undercover vehicle, in which the CW was driving. Surveillance video was also shot during the transaction. The substance delivered to the CW by Salazar was determined to be 55.1 grams of cocaine base with a purity of 61%.

12. On April 10, 2006, CW conducted a controlled purchase of cocaine base for $1,600 from Ricardo Daniel Salazar at _____, _ilver Spring, Maryland. The CW placed a consensually monitored phone call and arranged to meet Salazar at the Presidential Towers. Upon arriving at the Presidential Towers, the CW called Salazar and advised him that the CW was waiting in the parking lot. After waiting several minutes, the CW called Salazar again and asked what was taking so long. Salazar advised the CW that he was waiting for the crack cocaine to dry. When Salazar finally exited the Presidential Towers, he entered the undercover vehicle, in which the CW was driving. The CW and Salazar then conducted the transaction. The crack cocaine that Salazar delivered to the CW was still warm indicating that it had just been "cooked". The CW then drove Salazar to the parking lot of the McDonald's, which is located in the 9100 block of Riggs Road. Salazar exited the undercover vehicle and left on foot. The transaction was recorded by an audio/video recording device located in the undercover vehicle which the CW was driving. Surveillance video was also shot during the transaction. The substance delivered to the CW by Salazar was field-tested positive by the FBI for the presence of cocaine and has been submitted to the DEA Laboratory for analysis.

13. On June 19, 2006, the CW placed a consensually monitored call to Salazar. During the call, the CW and Salazar agreed to meet later that afternoon for a narcotics transaction. That meeting and transaction did not take place. Thereafter the CW made several attempts to contact

Salazar but none of the CW's calls were answered and the CW received no reply to the voice messages he left on Salazar's telephone. On June 28, 2006, agents of the FBI stopped the 2005 black Dodge Magnum bearing Maryland tag 1ATG87 which was being driven by Salazar. Salazar was placed under arrest and a set of keys were seized. Incident to Salazar's arrest agents of the FBI searched the passenger compartment of the vehicle but were unable to search the glove box accessible from the passenger compartment because the glove box was locked.

14. All of the controlled substances purchased in this investigation were forwarded to the Drug Enforcement Administration's Mid-Atlantic Regional Laboratory where they were subjected to quantitative and qualitative analysis by a qualified forensic chemist who will taetify to the analysis. The results of those tests as reported herein, were forwarded by the laboratory to your affiant.

## 2005 BLACK DODGE MAGNUM BEARING MARYLAND TAG 1ATG87

15. Ricardo Daniel Salazar utilizes this vehicle to distribute narcotics and in fact was arrested driving the vehicle on June 28, 2006 when he was the sole occupant of the vehicle. Salazar has been observed, by your affiant and other law enforcement utilizing the vehicle to conduct purchases and distribute large quantities of cocaine on numerous occasions. Your affiant has observed the vehicle parked in front of the registered owners residence on several occasions.

V.  **CONCLUSION**

16. Your affiant asserts that the facts contained within this affidavit establish probable cause to believe that the fruit, evidence and instrumentalities of violations of the laws of the United States, specifically 21 U.S.C. §§ 841(a)(1), are presently to be found in the above-described vehicle, including items listed in Section II of this affidavit. Therefore, in light of the circumstances and the

evidence adduced from this investigation, your affiant respectfully submits that probable cause exists for the issuance of a search warrant for the vehicle listed above.

_____
TUCKER G. VANDERBUNT, Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this JUN 29 2006 ____ day of June 2006.

_____
JOHN M. FACCIOLA
United States Magistrate Judge
for the District of Columbia